May it please the Court, Davina Chen on behalf of Reginald Edwards. I'd like to reserve two minutes for rebuttal. Last month in Navarrette v. California, the Supreme Court held that officers did not violate the Fourth Amendment when they stopped a silver Ford 150 pickup truck with a specific license plate number based solely on a 911 call reporting that a pickup truck of that same color, make, model, and license plate number had just run a caller off the road. Navarrette did not involve a full force, full custodial stop indistinguishable from an arrest. It did not involve a description of the suspect that is so general that it could cover a large segment of the population in the area. And it did not involve a suspect that met the highest level of generality. Ever since Terry v. Ohio, the Supreme Court has made clear that the touchstone of the Fourth Amendment is reasonableness and that courts, when analyzing police intrusions such as this one, must balance two things. The nature of the intrusion on individual rights and the facts available to the officers at the time of the intrusion. What Navarrette did do was provide some imprimatur, however limited it may be, on 911 calls, did it not? Yes, Your Honor. And we had already in our own Terry Crespo report, we had already in our own Terry Crespo case, analyzed the significance of a 911 call as opposed to just an ordinary anonymous tip. So does not Navarrette give some credibility to the reasonable suspicion that the police officers would have had to approach Mr. Edwards? Yes, it does. Navarrette does affect this case. It does say that anonymous calls, when they meet certain circumstances, do not need to be corroborated in their, you know, that the criminality need not be corroborated. But Navarrette involved a very specific description of a very specific car. Yes, but what was the description of the event here? The description of the individual or of the event? Of the event. The description of the event was that there was an individual who was driving, walking down the street, shooting at cars. Yes. There was a, well, they described him as a young black male, 5'7 to 5'9, maybe 19 to 20, wearing a black shirt and gray khaki pants. And when the police arrived, Mr. Edwards was the only person there who fit that description. Yes, but it is a very general description. And it didn't quite fit that description. Mr. Edwards was taller than the suspect. How tall? He was 5'11. And what was the, and so it's a difference between 5'9 and 5'11? Well, 5'7 to 5'9. Well, 5'9 and he was actually 5'11. Yes, but if the 911 call in Navarrette had involved a Honda Accord, certainly just as a Honda Accord. What if it said a Honda Accord and it was actually a Toyota? Or what if it said a Honda Accord and there was no driver's license number? So You can hypothesize, Counsel, but, you know, I'd stick with my hypothetical. If they described it as a Honda and it was a Toyota With no license plate number? I think the Supreme Court would have found differently. Yeah, I'm just trying to figure out. But in any event, the point is, there was a tip and it was a 911. And there was a, I think we'd all agree, I would hope, that it was a description of someone who was engaging in a highly dangerous and threatening act. Yes, but I'd like to make a point about that highly dangerous and threatening act because it was different from Navarrette in this instance. In Navarrette, it was drunk driving, which would be difficult to determine without stopping the driver. In this case, it was walking down the street, shooting at cars. There was only one report of this alleged act. Arriving on the scene, there was absolutely no evidence on the ground that there had been somebody who was shooting at cars, which you would expect to find. What? What would you expect to find? Perhaps broken glass, perhaps some fear in the neighborhood. Instead, there were just people milling around. But he was shooting, he was supposedly shooting at the cars passing by. Yes. And the police arrived at the very location three minutes later and found Mr. Edwards there, and he was the only person who fit the description. He fit the description, but the description itself was very, very vague. It may have been different if they arrived at the scene, they ordered him to stop, and they did a Terry Frisk. All they did was pat him down. But what they did was... Are you discounting entirely that the police had a legitimate safety concern at that point since it was alleged? In fact, it actually, to my way of thinking, is a more serious event than Navarrette. I mean, I see people on the 110 driving crazy all the time, and I'm not going to call 911 on all of them, but this is very, very serious. This is, he was shooting at the passing cars. Yes, but it was an anonymous tip. And I agree that Navarrette says that some anonymous tips have more reliability. Right, and it was, they, the reliability seems to be corroborated by their finding someone who fit the very description within three minutes. They found two individuals, and they did full force stops on both individuals. Now, the other individual would possibly have a section 1983 claim. He's not here in court, but I think that this court would find that the other individual, it was an unconstitutional stop as to the other individual. Okay, but you didn't answer my question as to whether there were legitimate safety concerns when the allegation, the suspicion involved shooting a gun at people. There are legitimate safety concerns. There were legitimate safety concerns in Washington versus Lambert when the suspects were, the suspected crime was 19 armed robberies. But this court held, because the specificity was lacking, when the officers pulled the gun plaintiffs in Washington versus Lambert out of the car, pointed their guns at them, ordered them onto the ground, and handcuffed them, that was not a stop. That was an arrest. Similarly, in this case, the specificity was lacking. So are you arguing, I take your point then, you're arguing that they may have had reasonable suspicion to do a modest Terry stop and pat down, but they did not have, they would have needed probable cause to go beyond that to do the things that they did? Yes, Your Honor, and I'm sorry if I have not been clear. The line is not right between a stop and arrest, but one of the things that this court considers is whether a reasonable innocent person would feel free to leave if they have guns pointed at them, they are ordered onto the ground, and they are handcuffed. Now I agree that this court has held, never in the case of an uncorroborated and anonymous tip, but this court has held that legitimate safety concerns can sometimes justify the use of the firearms, the handcuffing, the proning out, et cetera. But this court has never held that in the context of an uncorroborated, anonymous tip. So what do you think the police should have done here? I think that the police should have either corroborated that there had been such an event in this neighborhood by asking one of the many people around, was there somebody here shooting? But what should they have done with Mr. Edwards in the meanwhile? What they should have done was possibly pointed their guns at him. There were four officers with guns, and then they could do a Terry Frisk. They could pat him down. Well... They did not just pat him down. They jiggled his pants so that the gun fell out. Well, first they ordered him to his knees, and then they handcuffed him, and then they brought him up. They had him separate his legs, and then they patted him down, and then they jiggled the gun. Well, what if they hadn't handcuffed him or put him on? They just stopped him, said, put your hands against the wall, and then patted him down in the way they patted him down here. Would that have been okay? I would argue that still would not have been okay, because I don't believe there was reasonable suspicion. But if there was reasonable suspicion, then that would have been okay. But what happened in this case was much more than that. What happened in this case was there was nothing that the police officers could have done differently if this were an arrest. All right. Thank you, Counsel. By the way, Counsel, I want to compliment you on starting out by distinguishing Navarrette, because obviously that's the new elephant in the room. Thank you, Your Honor. Good morning. May it please the Court, Max Scheiner, appearing. No, he was complimenting your point. Oh, I understand that. That was clear to me. Max Scheiner, appearing for the United States. Thank you, Your Honor. I plan to start out by discussing Navarrette as well. Just three weeks ago... You don't get as many kudos. I don't expect to. Just three weeks ago, the Supreme Court held that an anonymous 911 call reporting some criminal activity, specifically dangerous driving that might indicate a person was driving drunk, was sufficiently reliable to allow an officer to reasonably rely upon it to conduct a Terry stop. Now, you're very right. The calculus in determining a Terry stop is weighing the suspicion, excuse me, the right of the party to be fee-free from intrusion against the type of suspicion and the concerns of law enforcement that a crime might be being committed. Navarrette dealt with, essentially claimed that there were three factors, held that there were three factors to be analyzed. Those were that the eyewitness claimed knowledge, that was certainly present in this case and known to the officers, that the report was contemporaneous. It certainly was also present and known to the officers because the 911 caller reported that he was seeing shots fired at passing cars and that the 911 system was used. So all three of these factors were present in the present case with the additional distinguishing element here that this was, as you said, Judge Wardlaw, and to my mind as well, a very much more dangerous event because it dealt with a gunman shooting on the streets of Inglewood. So did the officers know that the anonymous tip came via a 911 call? That's a very interesting question and the record is not clear as, oh, I've made the same mistake as my colleague did before. Would they have had reasonable suspicion if it had not been a 911 call? I believe they would have, and I want to get back to discussing the question, but the reason I'll say that is because even what was conveyed to them from the dispatcher and the transcript of those radio calls to the responding officers is in the record. The dispatcher conveyed that the reporting party is saying there's shots fired. He says he's shooting at passing cars, excuse me, walking around and shooting at passing cars. So conveying the additional detail that he was observing him walking, that he then reported that he was now walking eastbound on Hyde Park and then reported he's now inside the liquor store. So what was known to the officers was not just that the suspect with this particular description was shooting at passing cars, but that that suspect was being observed by the reporting party, be it a 911 caller or anyone else, who was on the line with the dispatcher as the officers were making their approach, which took them no more than three minutes to park, less than three minutes to park. So they sent questions to the dispatcher, which were then answered, indicating that that reporting party was still there. Now, the question of whether the officers knew that it was a 911 caller and therefore would be under California law clearly recorded and that the phone number would be in the possession of the dispatcher, the question What's the protocol? Is there any evidence about the protocol? Because I've done ride-alongs and heard those dispatches and they basically just say, you know, shots fired, blah, blah, blah. They don't say this is a 911 call. Correct. And I can tell you from 15 years of prosecuting cases in LA, some in state court, you know, where there is a 911 call recording is ordered in virtually every case where there is one, you know, that dispatcher is relaying factual information, not really, primarily to assist the officers in responding to let them know what they're going to see when they arrive. They are not typically describing, giving background information on the caller. Now, in this case, the whole issue of collective knowledge is arguably waived, at least the record below is insufficient to determine whether the officers had the knowledge that it was a 911 call as opposed to another, but it certainly seems quite likely that the officers already knew that and had that issue been raised, it would have been clarified whether the officers knew that it was a 911 call because that's the only way that calls come in. You know, in this day and age where we have the 911 system, it's just decades old, you know, if you call a police station, you'll get a recording oftentimes that says, if this is an emergency, call 911. That's really the primary way, perhaps even the only way that you report an emergency in this city, if not in this state, and those calls then go to the dispatcher, which goes to the officer. So the officer may have just been under the assumption, much like in Fernandez-Castillo, that the reporting party was a known person. But certainly the information known to the make those split-second decisions that you had to make. So you may run over time, so counsel addressed both reasonable suspicion and probable cause. Certainly one of our arguments is that whatever reasonable suspicion they had, they didn't have sufficient reason to conduct that kind of stop and frisk. Based on the use of force that they displayed. So could you address that? Yes, Your Honor. And probable cause was never argued to be the standard here. We never argued that there was probable cause. That's correct. But counsel ignores the long line of authority in this circuit, repeatedly held in this circuit and elsewhere, that additional force may be used to conduct a serious stop when there are legitimate safety concerns. In fact, this Court has held that the level of intrusion that can be used by officers in a high-risk situation can be tatamount, equal to that of a full-blown stop based on probable cause. This case, for that reason, is indistinguishable from U.S. v. Miles, which defense does not really discuss, because in that case, the emergency call was of shots fired. The officers respond and saw the suspect. The suspect description was no more particular than in this case. The description was a black male wearing an oversized jacket and riding a 10-speed bicycle. When the officers responded, it was 12 minutes later, not 4, it was 6 blocks away, not 75 feet, and they saw an individual who even more vaguely fit the description. He was a black male. He wasn't on a bicycle. He was standing in the vicinity of one. There were other black males in the area, and he was wearing an oversized jacket, which the Court made pains to state was not at all unusual for people in this area because it was Portland and it was in the middle of the night. But in that case, the Court said there was still, based on the nature of the call, enough exigency to justify pulling the guns on him and handcuffing him before conducting the pat-down search. The reason for that, and I would commend the Court to this case, it's from the Seventh Circuit, but I think it has the most trenchant analysis of the issues raised on this issue and others in the reply brief. U.S. v. Hicks, it's cited in my brief, but in that case, it said that the rule suggested by counsel, I have one minute, I'll finish up, was that additional corroboration would have to be gained upon arriving at the scene would result in this, that doubting 911 calls, which could be, in their words, disastrous, even cited a case of a 911 call refusing to pass on information about an emergency. Can I just ask one question before your time's up? Yes. Ms. Chin alluded to the fact that they also handcuffed and had their guns on a Hispanic man who did not fit the image. Does that fit the description? Does that belie the fact that they had reasonable suspicion as to Edwards? No, it does not. In fact, I'm pointing to the record at Excerpt 1, pages 23 and 28, where both of the two responding officers were asked whether they ever considered that person a suspect, and the answer was no. He was wearing a green jacket. So why did they handcuff him? Because he was standing within feet of the other suspect, and they had to dispel any suspicion that he may have been involved, but they clearly said they never believed he was a suspect. And even the officer's safety issue, if you're conducting a felony stop with guns drawn, and there's a person standing next to the person you are detaining, that other person would need to be secured so that he doesn't, for some reason, present a threat to himself by making a motion that would be not advised at that time. So I think it was more of an officer of public safety concern, but they clearly stated they did not consider him a suspect. All right. Thank you, counsel. Thank you, Your Honor. United States v. Edwards is submitted.
judges: Noonan, Wardlaw, Fisher